CASE NO. 14-1455

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

ERMIN KRESO, M.D.,
              Plaintiff - Appellant,

v.

ERIC SHINSEKI, Secretary
United States Department of Veterans Affairs,
UNITED STATES VETERANS
ADMINISTRATION
              Defendants - Appellees,

On Appeal from the Decision and Order in *Kreso v. Shinseki, et al.,* United States
District Court for the District of Colorado, Case No. 11-cv-02378-AP,
Judge Robert E. Blackburn

## APPELLANT'S REPLY BRIEF

Respectfully submitted,

ROSEMARY ORSINI, ESQ.
Attorney for Petitioner – Appellant
BERENBAUM WEINSHIENK PC
370 17th Street, Suite 4800
Denver, CO 80202-5698
303-825-0800
rorsini@bw-legal.com

May 14, 2015

{00438752:4}

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

ARGUMENT ................................................................................................1


A.     THE VA'S FACTUAL FINDINGS TO TERMINATE
DR. KRESO DID NOT RELY ON SUBSTANTIAL EVIDENCE. ..........1

     1.     Charge 1 – There is not substantial evidence to support the
VA's finding that Dr. Kreso failed to attend to patients
presenting to the Emergency Department for treatment ...................1

          a.     Specification 1 – WB .............................................................1

          b.     Specification 2 – DW............................................................2

          c.     Specification 5 – IS ..............................................................4

     2.     Charge 3 – Specification 2. There is not substantial evidence
to support a finding that Dr. Kreso was negligent in his
treatment of Patient GS or delayed his care .....................................4

     3.     Charge 6 – The incident between Judith Cooley and
Dr. Kreso was not disruptive behavior..............................................6

B.     DR. KRESO'S FUNDAMENTAL RIGHT TO DUE PROCESS
WAS VIOLATED WHEN HE WAS NOT PERMITTED TO
CONFRONT THE EVIDENCE AND WITNESSES AGAINST
HIM................................................................................................................7

     1.     Dr. Kreso did not receive minimal requirements of due
process when the VA denied him the opportunity to confront
the evidence against him ....................................................................7

2.   Dr. Kreso did not receive minimal requirements of due process when he was denied an opportunity to cross-examine the witnesses whose testimony was used against him ..................................................................................8

3.   Dr. Kreso's due process rights were violated when he was prohibited from calling other witnesses including an expert who would have testified to his standard of care ...........................11

4.   The DAB decision was arbitrary and capricious and not in accord with VA policy of penalizing employees in proportion to the charge of offense and similar offenses with penalties .........................................................................................14

CONCLUSION ..................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Douglas v. Veterans Admin.,* 5 MSPB 313, 332-3, 5 M.S.P.R. 280 (1981)............14

*Hannah v. Larche*, 363 U.S. 420, 80 S.Ct. 1502 (1960).................................. 10, 11

*McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205 (10th Cir. 2000).....................9

*McGhee v. Draper,* 564 F.2d 902 (10th Cir. 1977) ...................................................9

*Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963 (1974) ......................................10

**Statutes**

42 U.S.C. § 1395dd...................................................................................................2

**Other Authorities**

*VHA Handbook 5021, Part II, Chapter 1, 7(2))* ............................................. 14, 15

**Rules**

Fed. R. App. P. 32(a)(7)(B) ...................................................................................16

Fed. R. App. P. 32(a)(7)(B)(iii) .............................................................................16

<u>**ARGUMENT**</u>

**A.  THE VA'S FACTUAL FINDINGS TO TERMINATE DR. KRESO DID NOT RELY ON SUBSTANTIAL EVIDENCE.**

The Defendant-Appellee United States Veterans Association (the "VA") decision to terminate Plaintiff-Appellant, Ermin Kreso, M.D. ("Dr. Kreso") was not supported by substantial evidence.

**1.  <u>Charge 1 – There is not substantial evidence to support the VA's finding that Dr. Kreso failed to attend to patients presenting to the Emergency Department for treatment.</u>**

**a.  Specification 1 – WB**

Patient WB presented to the Emergency Department ("ED") with a complaint that his urinary catheter was not draining. (Aplt. App. at 1469). Susan West ("Nurse West"), the triage nurse, triaged WB and spoke with Dr. Kreso about WB's treatment. (Aplt. App. at 763:15-18). WB was treated by Florence McNeal, R.N. ("Nurse McNeal"). (Aplt. App. at 1469). Nurse West did not request that Dr. Kreso treat the patient (Aplt. App. at 763:11-12). Dr. Kreso believed that WB was triaged as a level 5, at which level WB did not require to be seen by a physician, and stated this during the Disciplinary Appeal Board ("DAB") hearing. (Aplt. App. at 2112-2153).

Dr. Kreso acknowledges that he did not treat WB. However, substantial evidence does not exist to support the requirement that Dr. Kreso was required to

examine triage level 4 and level 5 patients. The VA ineffectively argues that department policy required Dr. Kreso to treat every patient including triage level 4 and 5 patients. (Appellees Answer Brief ("Answer") at p.18) when there are numerous conflicting policies that say otherwise (Aplt. App. at 130:5-25**;** 611:2-5; 2112-2153).

The Emergency Medical Treatment and Labor Act ("EMTALA") codified at 42 U.S.C. § 1395dd does not apply to the VA as it is not a Medicare hospital. (Aplt. App. at 134:7-19). In its Answer Brief, the VA misstates that all VA patients have an expectation that they receive will a medical screening exam from a qualified medical practitioner citing to the EMTALA.

Dr. Meyer, Dr. Baker, and Dr. Weinshenker, all ED supervisors, testified that no written policies or guidance had been generated regarding the EMTALA. (Aplt. App. at 131:8-11, 202:24-203:14, 621:9-14).

### b.    Specification 2 - DW

There is not substantial evidence to support the charge that Dr. Kreso failed to attend to patients presenting to the ED for treatment because DW did not present to the ED for care or treatment. DW presented to the Administrative Officer on Duty ("AOD"), not the ED, requesting lodging. (Aptl. App. at 293:11-22; 768:21-769:19; 2199). The AOD spoke with Dr. Kreso because DW did not bring any

medications or sufficient oxygen with him (Aplt. App. at 770:4-8), which is contrary to the lodging guidelines; and if a veteran does not comply with the guidelines, they must relinquish their lodging privileges and seek lodging at their own expense. (Aplt. App. 1168-1171). Lodging at the VA hospital is a privilege for veterans, not a right and the veterans must comply with the guidelines.

There is also not substantial evidence that DW was ever in respiratory distress requiring treatment by the ED. When Dr. Kreso first spoke with DW (and the AOD about ordering oxygen) he was not out of oxygen, did not have shortness of breath, and was not in respiratory distress; and, DW remained in this condition while he was in the waiting room ordering oxygen. (Aplt. App. 673: 22-674:4; 676:14-25; 772:7-14). The VA cites to Officer Neil Weston ("Officer Weston"), a VA police officer to allege that DW was in severe respiratory distress. However, this testimony is contrary to Officer Donald DeDiemar ("Officer DeDiemar") who responded to the waiting room along with Officer Weston because of DW's behavior in the waiting room. (Aplt. App. at 671:5-10). Officer DeDiemar testified that DW was sitting at the front desk, talking loudly (almost yelling) on the telephone demanding he be brought oxygen. (Aplt. App. at 673:3-19). At this time, he was not in any way short of breath (Aplt. App. at 675:18-22).

### c. Specification 5 – IS

There is not substantial evidence to support the DAB's determination that Dr. Kreso failed to attend to Patient IS. Two witnesses testified to IS's treatment, IS and Dr. Kreso. Dr. Kreso testified that he performed an ENT exam, examined all four lobes, IS had normal vital signs, and he never complained of chest pains or shortness of breath. (Aplt. App. at 800:5-802:16). Also, there is no evidence in the nurse's triage notes that IS complained of chest pains. The DAB found IS credible even though he falsely testified that he told the nurse he had chest pains and the extent of the examination by Dr. Kreso. (Aplt. App. at 2205).

Further, any allegations that Dr. Kreso purportedly treated IS inappropriately or criticized him is irrelevant to the charge that Dr. Kreso failed to attend to Patient IS or that his treatment of IS fell below the standard of care. Dr. Kreso's demeanor, comments, or attitude is irrelevant to his medical treatment of patients.

### 2. <u>Charge 3 – Specification 2. There is not substantial evidence to support a finding that Dr. Kreso was negligent in his treatment of Patient GS or delayed his care.</u>

Substantial evidence does not support that Dr. Kreso even treated GS, let alone that he provided negligent treatment and/or delayed his care. Dr. Kreso testified that he would not have decreased the triage level of GS because he knew his condition and if he had known GS was triaged at a level 3, he would have

increased the triage level. (Aplt. App. at 809:22-810:10). Dr. Kreso also testified that he was not even aware that Charge 3, Specification 2 was about GS until he saw the witness list for the DAB hearing. (Aplt. App. at 808:8-808:13). Despite this testimony and the undisputed facts that full patient names were not provided to Dr. Kreso during the AIB hearing or when Dr. Kreso submitted written responses to the AIB, the DAB decided without any substantial evidence, that Dr. Kreso was not credible because his testimony at the DAB was different from his testimony at the AIB. This finding is meritless. Clearly, without knowing the full name of the patient he treated, Dr. Kreso was merely confused as to the patient at issue and therefore, the treatment provided; and once he was provided with the actual patient name and portion of the medical record, he testified correctly at the DAB hearing. (Aplt. App. at 808:14-19; 809:10-13).

In their determination, the DAB also completely disregarded the testimony of GS's wife ("Mrs. GS") who testified that Dr. Kreso had provided treatment to GS on numerous occasions and that she had no complaints about Dr. Kreso's care of GS. (Aplt. App. at 368:6-9). Notably, Mrs. GS never testified that Dr. Kreso treated GS on the day of the allegations of the negligent treatment, nor did the VA even question her about seeing Dr. Kreso on the day in question.

Instead, the DAB unreasonably found Sylvia Murray credible and relied solely on her disputed testimony. Ms. Murray clearly had a personality conflict and obvious disdain for Dr. Kreso. (Aplt. App. at 1585:13-23). Ms. Murray testified at the AIB that Dr. Kreso changed the triage level of GS because Ms. Murray's personal opinion was that "he didn't want to take care of the patient… he did not want to see [him]." (Aplt. App. at 1582:17-25). However, Dr. Kreso would not have seen that patient anyway, because GS arrived during the last hour of his shift and another physician would have provided the care. Ms. Murray even testified that Dr. Kreso left while GS was at the ED. (Aplt. App. at 1581:25-1582:2). The DAB lacked substantial evidence to sustain this charge.

### 3. Charge 6 – The incident between Judith Cooley and Dr. Kreso was not disruptive behavior.

The incident that occurred between Dr. Kreso and Judith Cooley ("Ms. Cooley") did not rise to disruptive behavior.

The DAB misconstrues Ms. Cooley's report that Dr. Kreso prevented Ms. Cooley from calling Dr. Weinshenker to include him in the conversation they were having about Dr. Kreso's patient schedule. (Compare Aplt. App. at 1130 and 2209). Instead, Ms. Cooley reported that Dr. Kreso said it was not necessary to call Dr. Weinshenker to have the conversation about his schedule and that once she picked up the phone to call Dr. Weinshenker, he left. (Aplt. App. at 1130). The VA

incorrectly cites to the record that Dr. Kreso refused to leave Ms. Cooley's office until she picked up the phone to call Dr. Weinshenker. Ms. Cooley's report stated no indication that she requested Dr. Kreso to leave her office.

Ms. Cooley's testimony also contradicts her report as she never stated that she was afraid Dr. Kreso was going to hurt her or feared for her physical safety in her report. (Aplt. App. at 1130). Further, Ms. Cooley did not even file the report until requested to do so. (Aplt. App. at 346:12-14).

**B.    DR. KRESO'S FUNDAMENTAL RIGHT TO DUE PROCESS WAS VIOLATED WHEN HE WAS NOT PERMITTED TO CONFRONT THE EVIDENCE AND WITNESSES AGAINST HIM.**

**1.    <u>Dr. Kreso did not receive minimal requirements of due process when the VA denied him the opportunity to confront the evidence against him.</u>**

The VA never provided Dr. Kreso with the minimal requirements of due process. Dr. Kreso does not dispute that his proposed termination, its review, and the DAB appeal were not a lengthy procedure or that they took a substantial amount of time. Instead, Dr. Kreso's due process rights were violated by the inadequacy of the procedures themselves. Even prior to Dr. Kreso's termination, he was not provided a meaningful opportunity to present his side of the case. During the VA's investigation, the VA only provided Dr. Kreso with a limited amount of evidence; yet, in making its determination, it considered all of the

evidence in its file. (Aplt. App. at 2195, 2197). It is undisputed that Dr. Kreso was

not provided with all of the evidence he requested including complete medical

records of the patients referenced in the AIB. (Answer at p. 45, fn. 17; Aplt. App.

at 2195). The failure to provide evidence negatively impacted Dr. Kreso because

he was first questioned by the AIB without knowing what patients they were even

asking him about, and then he had to testify again about some of the same patients

at the DAB hearing without being provided their complete medical records. The

DAB then found Dr. Kreso's testimony was at odds with the AIB and his written

responses during the investigation, even though the DAB testimony was when

Dr. Kreso was finally provided with patient names and partial medical records.

(Aplt. App. at 2197).

2.     **Dr. Kreso did not receive minimal requirements of due process
       when he was denied an opportunity to cross-examine the
       witnesses whose testimony was used against him.**

During the DAB hearing, Dr. Kreso's due process rights continued to be

violated when he was not permitted to cross-examine witnesses who had

previously testified in front of the AIB, yet the DAB considered those prior

testimonies in its decision. The VA in its Response argues that cross-examination

of witnesses at an administrative hearing is not an absolute right, but then fails to

identify the circumstances in those cases where due process was not violated when cross-examination was not permitted.

The facts in Dr. Kreso's case are distinguishable from the cases the VA cites in their Answer. The VA cited to *McClure* arguing that undisputed facts render cross-examination unnecessary. (Answer at p. 39). However, the charges brought against Dr. Kreso contain an abundance of disputed facts.

In *McClure,* an elementary school principal brought a legal action alleging that termination of her employment deprived her of due process. *McClure* cited to numerous cases including *McGhee* where it concluded that because the termination was based on accusations that "might stain a reputation and threaten a livelihood," "confrontation and cross-examination were essentials of due process and should not have been denied." *McGhee v. Draper,* 564 F.2d 902, 911-912 (10th Cir. 1977).

*McClure* distinguished its facts from *Rosewitz,* and noted that the court "did not address the nature of the accusations against the plaintiff, or give them any weight in balancing the interests involved." *McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1212 (10th Cir. 2000). The court also found that *Rosewitz* had little relevance given the facts before it. *Id.* Similarly, *Rosewitz* has little relevance to the facts here, given the severity of the accusations against Dr. Kreso.

The VA also cites to *Wolff*, a case where an inmate of a Nebraska state prison brought a legal action alleging that prison disciplinary proceedings did not comply with due process. The U.S. Supreme Court found that

> due process imposed certain minimum procedural requirements which must be satisfied before parole could finally be revoked. These procedures were: "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); …

*Wolff v. McDonnell*, 418 U.S. 539, 559, 94 S.Ct. 2963, 2976 (1974). Here, there is no evidence that the DAB specifically found good cause for not permitting Dr. Kreso to cross-examine adverse witnesses, whose testimony they relied on in making their decision.

Further, the VA misconstrues the nature of the administrative proceeding in *Hannah.* In *Hannah,* the Commission on Civil Rights, established by Congress in 1957, was investigating voting deprivations of African-Americans. *Hannah v. Larche*, 363 U.S. 420, 421, 80 S.Ct. 1502, 1504 (1960). It was not an administrative proceeding for termination of employment. *Id.* at 440. The Court in *Hannah* court acknowledged that requirements of due process frequently vary with the types of proceedings involved and that the nature of the matter before it was purely investigative and fact-finding, but not adjudicative; and that it did not make

determinations "depriving anyone of his life, liberty, or property." *Id.* at 440-441.

The Court further stated that

> [W]hen governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.

*Id.*

In short, given that Dr. Kreso faced not only termination, but also a stain to his reputation and his livelihood was threatened, cross-examination of witnesses whose testimony the DAB considered was fundamental.

**3.      Dr. Kreso's due process rights were violated when he was prohibited from calling other witnesses including an expert who would have testified to his standard of care.**

During the DAB hearing, Dr. Kreso's due process rights were violated when he was prohibited from calling other witnesses including an expert who would have testified to his standard of care, when the DAB relied on expert testimony favoring the VA.

Dr. Kreso provided his list of witnesses to the DAB and to the VA. (Aplt. App. at 1053-1054). Approximately two weeks prior to the hearing, Dr. Kreso objected to the VA calling numerous witnesses and notably argued that the VA had

not made any of those witnesses available (who were all under the VA control) for Dr. Kreso to interview prior to the DAB hearing and also requested that the VA make numerous witnesses available for the DAB hearing. (Aplt. App. at 986-988).

Further, the VA misconstrues the right to subpoena witnesses in DAB proceedings. While Dr. Kreso did have a legal right to subpoena witnesses, in DAB proceedings, such action is not necessary for VA employees. Pursuant to the DAB hearing information and instructions sent to Dr. Kreso on June 2, 2010 from Dr. Ciaran O'Hare, the Chairperson of the DAB, it stated "[T]he Chief of Human Resources Management Service will arrange for the availability of requested witnesses who are VA employees. However, it will be your responsibility to arrange for the appearance of any non-VA employee witnesses that you intend to call." (Aplt. App. at 2169- 2171). The VA in its Answer misstates the record in arguing that there is "no evidence that Dr. Kreso sought to secure the attendance at the hearing, by subpoena or otherwise, of any of the witnesses he now claims he needed to cross examine." (Answer at p. 41). Pursuant to the DAB rules procedures set forth in the June 2, 2010 letter, it was the VA who was responsible for securing the VA employee witnesses that Dr. Kreso requested the VA make available in its witness disclosure letter two weeks prior to the DAB hearing.

Simply, Dr. Kreso made his request to the VA and the VA failed to comply and make the witnesses available.

Prior to providing his list of witnesses, Dr. Kreso had no knowledge of Dr. Brian J. Hancock ("Dr. Hancock")'s expert report and the AIB's reliance on it. Later, that same day, after Dr. Kreso objected to witnesses, the VA purportedly submitted additional discovery to the DAB, but nowhere in the disclosure did the VA ever state that the AIB was provided or relied on Dr. Hancock's expert report. (Aplt. App. at 991-994). This additional discovery of Dr. Hancock's report was also provided months after the DAB denied Dr. Kreso's request to present an expert witness on the basis that its members have "sufficient professional knowledge to evaluate the specific issues of clinical competence and/or direct patient care involved in the appeal." (Aplt. App. at 1056). Yet, the AIB requested Dr. Hancock's report because none of its panel had sufficient ED experience, and then the DAB reviewed Dr. Hancock's expert report after denying Dr. Kreso's request to present an expert witness to testify as to his standard of ED care.

Further, the DAB requested from Dr. Kreso's counsel that she "carefully reconsider, [and] greatly shorten" her witness list. (Aplt. App. at 1039). Then, during the hearing, the DAB prevented Dr. Kreso from calling Nurse McNeal, a VA employee, as a witness (Aplt. App. at 942:23-943:24).

**4.** **The DAB decision was arbitrary and capricious and not in accord with VA policy of penalizing employees in proportion to the charge of offense and similar offenses with penalties.**

The DAB's failure to compare the penalty of discharge given to Dr. Kreso to discipline given for similar offenses resulted in an arbitrary and capricious decision. Discharging Dr. Kreso did not comport with the VA's own regulations and did not consider the relevant factors and strike a reasonable balance within tolerable limits. *Douglas v. Veterans Admin.,* 5 MSPB 313, 332-3, 5 M.S.P.R. 280 (1981). The DAB failed to compare the penalty of discharging Dr. Kreso to discipline given for like offenses.

The DAB acknowledged that the reasons would warrant a more severe disciplinary action include the facts of the case, the degree of willfulness of the employee's violation of the VA conduct rules, the seriousness of the misconduct or deficiency or incompetence, and the resultant impact on VA guidelines. (Answer at p. 53; Aplt. App. at 2213; both *citing VHA Handbook 5021, Part II, Chapter 1, 7(2)).*

Here, the facts of the case exemplify that Dr. Kreso did not fail to attend to patients presenting to the ED for treatment and that the ED policy is unclear and has discrepancies within its own requirements. The VA's Emergency Department Policy corroborates Dr. Kreso's testimony that the policy of the VA did not require

him to treat all patients presenting at the ED. (Aplt. App. at 1220-1221, 1222).

These policies were signed by Dr. Thomas J. Meyer, Chief of Ambulatory Care

("Dr. Meyer"), and Dr. Baker, respectively, and provided to all patients seeking

ED treatment. *Id.* Lynette Roff ("Ms. Roff") testified she had not seen a policy and

procedure in the ED that states physicians must treat every patient who walks in

the door. (Aplt. App. at 611:2-6). Dr. Kreso authored a memorandum on behalf of

the ER 5-Level Committee that instructed staff and physicians that patients with

stable vital signs who require no resources were to call the appropriate medical

care provider and request a clinic visit on a routine basis. (Aplt. App. at 1159).

Patients triaged at level 4 and 5, were to be seen by clinic staff, not ED physicians.

(*Id.*) Further, the DAB in its Determination cited numerous policy discrepancies

and stated it was troubled that through three ED supervisors no written policies or

guidance were ever generated. (Aplt. App. at 2210-2211).

Any finding of intentional wrongdoing by Dr. Kreso is contradicted by the

vast lack of any defined ED/triage policy and lack of instructions and supervision.

Further, the record does not support any evidence of incompetence of Dr. Kreso

and there was no testimony of actual harm to patients or the VA's reputation.

(Aplt. App. at 2213-2215).

## CONCLUSION

For the reasons set forth above, the DAB's determination must be reversed. The DAB decision, approved by the Under Secretary, was not supported by substantial evidence, was obtained without following fundamental due process procedures required by law, rule, or regulation, and was otherwise not in accordance with the VA policy of penalizing employees in proportion to the character of the offense and treating similar offenses with similar penalties.

Most importantly, Dr. Kreso was denied his fundamental due process rights in responding to the charges against him resulting in a decision by the DAB that was arbitrary and capricious and an abuse of discretion.

## CERTIFICATION UNDER FED. R. APP. P. 32(a)(7)(B)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains <u>3588</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

>(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

>(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection Small Business Edition, Version 12.1.4013.4013, updated May 14, 2015 and according to the program are free of viruses.

<u>*s/ Rosemary Orsini*</u>
Rosemary Orsini

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May, 2015, a true and correct copy of the **APPELLANT'S REPLY BRIEF** was served upon the following counsel of record via electronic service and hand delivery:

Susan Prose
Assistant United States Attorney
U.S. Attorney's Office for the District of Colorado
1225 17th Street, Suite 700
Denver, CO 80202
susan.prose@usdoj.gov

*Original document on file at*
*Berenbaum Weinshienk PC*

*/s / Pamela Burkhardt*
Pamela Burkhardt
